IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**SYLVESTER SINGLETON,**

       **Plaintiff,**

v.                                                                                         CIV 02-1014 LAM

**JO ANNE B. BARNHART,**
**Commissioner, Social Security Administration,**

       **Defendant.**

# MEMORANDUM OPINION AND ORDER

      **THIS MATTER** is before the Court on Plaintiff's Motion to Reverse or Remand Administrative Agency Decision (*Doc. 9*), filed on January 31, 2003. In accordance with 28 U.S.C. §636(c)(1) and FED. R. CIV. P. 73(b), the parties have consented to having the undersigned United States Magistrate Judge conduct all proceedings and enter final judgment in this case. The Court has reviewed Plaintiff's motion and the memorandum in support of the motion, Defendant's response to the motion, Plaintiff's reply to the response and relevant law. Additionally, the Court has carefully reviewed and considered the entire administrative record (hereinafter "Record"). For the reasons set forth in this Memorandum Opinion and Order, the Court **FINDS** that Plaintiff's motion should be **DENIED** and the decision of the Commissioner of Social Security (hereinafter "Commissioner") **AFFIRMED**.

## I.  Procedural History

      Plaintiff was born on May 18, 1950. (R. at 39.)  He stopped working in 1991, when he was forty years old. (R. at 42 - 43.)  Plaintiff has a high school education and vocational training in

electronics. (R. at 110.) His past work experience was as a telephone lineman and a bus cleaner. (R. at 110, 116 - 118, 145.)

Plaintiff filed applications for disability insurance benefits and supplemental security income in May of 1998, alleging that he had been disabled since July 1, 1991, due to knee surgeries and mental problems which he claimed prevented him from being able to work. (R. at 97 - 99, 106 - 111, 302 - 304.) There are also allegations in the record that Plaintiff suffers from diminished visual acuity in his right eye, carpal tunnel syndrome and a seizure disorder. (*See, e.g.,* R. at 40, 43 - 44, 104.) Plaintiff only satisfied the insured status requirement for disability insurance benefits through December 31, 1996. (R. at 101.) Thus, to be eligible for disability insurance benefits, Plaintiff was required to prove that he was disabled on or before December 31, 1996. *See*, *Henrie v. U.S. Department of Health & Human Services*, 13 F.3d 359, 360 (10th Cir. 1993). Because there is no insured status requirement for supplemental security income, the relevant time period to consider for supplemental security income was from July 1, 1991, the date Plaintiff claims he became disabled, to February 25, 2000, the date of the decision by the Administrative Law Judge (hereinafter "ALJ"). (R. at 25.) *See, e.g., Wilson v. Apfel*, 179 F.3d 1276, 1279 (11th Cir. 1999).

Plaintiff's claims were denied initially and upon reconsideration by the Social Security Administration. (R. at 80 - 83, 86 - 88). Thereafter, Plaintiff filed a timely request for hearing. (R. at 89 - 90.) The ALJ held a hearing on Plaintiff's claims on November 16, 1999. (R. at 35 - 75.) Plaintiff, his wife and a vocational expert (hereinafter "VE") testified at the hearing. (R. at 35 - 75.) Plaintiff was represented by counsel at the hearing. (R. at 37.) The applied the five-step evaluation sequence required by 20 C.F.R. §§ 404.1520 and 416.920 (2003), and concluded that Plaintiff was not under a "disability", as defined in the Social Security Act and regulations, at any time from July

1, 1991, the alleged date of onset of Plaintiff's disability, through February 25, 2000, the date of the ALJ's decision. (R. at 25.)

Specifically, in applying the five-step evaluation sequence, the ALJ determined that: (1) Plaintiff had not engaged in substantial gainful activity since July 1, 1991; (2) Plaintiff had an impairment or a combination of impairments considered "severe"; (3) Plaintiff's impairments did not meet or equal an impairment contained in the listing of impairments at 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2003) (hereinafter "Listing of Impairments"); (4) Plaintiff was unable to perform his past relevant work; and (5) there were a significant number of other jobs in the national economy that Plaintiff could perform given his residual functional capacity (hereinafter "RFC") and vocational factors. (R. at 24 - 25.) In concluding that Plaintiff was not disabled and denying benefits at the fifth step of the evaluation sequence, the ALJ found that Plaintiff had the RFC for medium work activity with the following limitations: (1) he was not able to stand or walk for prolonged periods of time without sitting; (2) he was limited by his non-exertional limitations to jobs that do not require extensive stooping, squatting or bending, and do not require digital dexterity or acute vision to perform basic requirements of the job; and (3) he was further limited by his mental impairment to simple, routine, non-public work. (R. at 24.) The VE testified, and the ALJ found, that Plaintiff could work in such jobs as production line assembler and machine operator. (R. at 25, 70 - 73.)

Plaintiff requested review of the ALJ's decision by the Appeals Council. (R. at 11.) Plaintiff submitted additional evidence to the Appeals Council which was made a part of the record consisting of: (1) a letter from Plaintiff's counsel dated April 18, 2000; (2) Counseling Associates, Inc. records from April 10, 2000, to January 17, 2001; (3) an electrodiagnostic report by Meenakshi Nayak, M.D., dated April 25, 2000; and (4) a report by Shezhad Jinnah, M.D., dated January 10, 2001. (R. at 315 -

323.) The Appeals Council considered this additional evidence but concluded that it did not provide a basis for changing the ALJ's decision. (R. at 7 - 9.) The Appeals Council declined review on June 21, 2002, making the ALJ's decision the final decision of the Commissioner. (R. at 7 - 9.) Plaintiff then filed this action.

On appeal, Plaintiff claims that the Commissioner erred in: (1) evaluating Plaintiff's mental impairment; (2) evaluating Plaintiff's physical impairment; and (3) evaluating Plaintiff's credibility. Plaintiff asks the Court to reverse the Commissioner's decision or, in the alternative, to remand the Commissioner's decision for a new administrative hearing. The Court confines its recitation of the facts to those necessary to its disposition.

## II.  Standard of Review

Judicial review of the Commissioner's determination that Plaintiff is not disabled within the meaning of the Social Security Act is limited.  If substantial evidence in the record as a whole supports the decision of the Commissioner and the correct legal standards were applied, the decision stands and Plaintiff is not entitled to relief. *See, e.g., Hamilton v. Secretary of Health & Human Services*, 961 F.2d 1495, 1497 - 1498 (10th Cir. 1992). The Court can neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *See, e.g., Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Castellano v. Secretary of Health and Human Services*, 26 F.3d 1027, 1028 (10th Cir. 1994). Evidence is insubstantial if it is overwhelmingly contradicted by other evidence. *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).

### III.  Discussion/Analysis

### A.  Evaluation of Plaintiff's Mental Impairment

Plaintiff argues that the ALJ made the following errors in evaluating Plaintiff's mental impairment: (1) concluding that the Global Assessment of Functioning (hereinafter "GAF") Scale[1] score of 80 assigned to Plaintiff by one-time consultative psychiatrist Robert L. Karp, M.D., was consistent with the GAF scores assigned to Plaintiff by other psychiatrists who examined him (R. at 20); and (2) engaging in "double-talk" by finding that Plaintiff's mental impairment was severe, but not as severe as those described in Listing 12.04, and then considering the limitations imposed by Plaintiff's mental condition in assessing Plaintiff's RFC.

#### *1.  Plaintiff's GAF Scores*

In evaluating Plaintiff's mental impairment, the ALJ concluded that the GAF score of 80, assigned to Plaintiff by one-time consultative psychiatrist Robert L. Karp, M.D., was consistent with the GAF scores assigned to Plaintiff by other psychiatrists who had examined him, even while he was in prison.  (R. at 20.)  Plaintiff contends this conclusion was in error because it meant the ALJ relied on Dr. Karp's one-time consultative report over all other treating physicians.  The Court does not agree.  The ALJ did not fail to consider or reject the GAF scores in the record assigned to Plaintiff

---

[1]The GAF Scale is a rating system on a scale of zero to one-hundred that is used by clinicians to assess an individual's overall level of functioning.  It is used to rate individuals with respect to their psychological, social and occupational functioning.  The GAF Scale is divided into ten ranges of functioning and each ten-point range in the GAF Scale has two components.  The first component covers symptom severity and the second component covers functioning.  The final GAF Scale rating always reflects whichever of the two is worse.  In most instances, GAF Scale ratings should assess an individual's level of functioning at the time of the evaluation. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 - 34 (4th ed., Text Revision, 2000) (hereinafter "DSM-IV-TR").

by his treating physicians. The ALJ merely concluded that these scores were consistent with the GAF score assigned to Plaintiff by Dr. Karp. More importantly, the ALJ did not base his evaluation of Plaintiff's mental impairment solely on Dr. Karp's GAF score and opinion. The ALJ also considered the rest of the medical evidence in the record in reaching his conclusion that Plaintiff was not disabled and had the RFC for medium work activity with limitations.

The GAF scores in the record are as follows. At the request of the Commissioner, Plaintiff was examined by Dr. Karp on September 23, 1998. (R. at 210 - 213.) In his examination report, Dr. Karp assigned Plaintiff a GAF score of 80.[2] (R. at 213.) A GAF score of 80 is consistent with no more than slight impairment in functioning and, if symptoms are present, they are transient and expectable reactions to psychosocial stressors.[3] There are three other GAF scores in Plaintiff's medical records based on assessments by treating physicians.[4] While Plaintiff was in prison,

---

[2]Dr. Karp concluded that Plaintiff did not have a clear history of bipolar disorder or obsessive-compulsive disorder, but had mental problems primarily "of an Axis II type" that also involved drug use. (R. at 212.) He suggested further testing to rule out organic damage and any possibility of bipolar disorder. (R. at 212.) Dr. Karp diagnosed Plaintiff with attention deficit hyperactivity disorder ("ADHD") and noted a history of mild depression which persisted to the present. (R. at 212.) Dr. Karp's Axis I and Axis II clinical impressions of Plaintiff were as follows: moderate dysthymia, stimulant and alcohol dependence (not current), tobacco dependence, ADHD and personality disorder with antisocial traits. (R. at 212 - 213.) Dr. Karp concluded that Plaintiff "would have minimal impairment in his ability to understand and remember basic instructions, or to concentrate and persist at tasks of basic work". (R. at 213.) He also concluded that Plaintiff "probably has minimal impairment, if any, in his ability to interact with the general public or co-workers and to adapt to changes in the workplace." (R. at 213.)

[3]DSM-IV-TR at 34.

[4]The record also includes a one-time GAF score assessment of Plaintiff by social worker Pé Gerard Weideman. (R. at 318.) Weideman assessed Plaintiff as having a GAF score of 49 in a report dated April 10, 2000, that was submitted to the Appeals Council after issuance of the ALJ's decision. (R. at 317 - 318.) Weideman's GAF score assessment and report are not acceptable evidence of Plaintiff's mental impairment. Under the Social Security regulations, a social worker is not an acceptable medical source for establishing the mental impairment alleged by Plaintiff. 20 C.F.R.

psychiatrist Blanca Kampa, M.D., assessed Plaintiff as having a GAF score of 65[5] on one occasion in September of 1997 (R. at 171), and having a GAF score of 70[6] on five occasions in October and November of 1997, and January and February of 1998 (R. at 164 - 167, 169). After Plaintiff left prison, psychiatrist Truett Maddox assessed Plaintiff as having a GAF score of 35 - 45[7] on one occasion in December of 1998 (R. at 256, duplicate at 298).

Dr. Kampa, a treating physician, saw Plaintiff six times in 1997 and 1998, according to the record. (R. at 164 - 167, 169, 171.) The GAF scores of 65 and 70 that she assigned to Plaintiff on those occasions indicate only mild symptoms or some difficulty in social, occupational or school functioning but generally functioning pretty well. These scores are not a significant departure from, or inconsistent with, the GAF score of 80 that Dr. Karp assigned to Plaintiff which indicated milder symptoms, if any, or slight impairment in social, occupational or school functioning. Thus, the record

---

§§ 404.1513(a) and 416.913(a) (2003). Additionally, Weideman's report does not relate to the period under review because it is dated after the ALJ's decision and relates to the period after the ALJ's decision. 20 C.F.R. §§ 404.970(b) and 416.1470(b) (2003). For new evidence to be considered, it must relate to the period on or before the date of the ALJ's decision. *See, e.g., O'Dell v. Shalala,* 44 F.3d 855, 858 - 859 (10th Cir. 1994).

[5] A GAF score of 65 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well", with some meaningful interpersonal relationships. DSM-IV-TR at 34.

[6] A GAF score of 70 indicates some mild symptoms or some difficulty in social, occupational or school functioning, but "generally functioning pretty well", with some meaningful interpersonal relationships. DSM-IV-TR at 34.

[7] A GAF score of 35 - 45 ranges from: (a) "some impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; to (b) "serious symptoms" or "any serious impairment in social, occupational or school functioning". DSM-IV-TR at 34.

supports the ALJ's conclusion that the GAF scores assigned to Plaintiff by Dr. Kampa were consistent with the score assigned by Dr. Karp.

Dr. Maddox, also arguably a treating physician, saw Plaintiff only once in 1998 according to the record. (R. at 256, duplicate at 298.) While the GAF score of 35 - 45 that he assigned to Plaintiff indicates more serious symptoms or impairment in functioning than the scores assigned by Drs. Kampa and Karp, other findings in Dr. Maddox's psychiatric evaluation report indicate more moderate symptoms or impairment in functioning consistent with the GAF scores assigned by Drs. Kampa and Karp. Dr. Maddox noted in his evaluation report that Plaintiff was cooperative and spoke spontaneously. (R. at 256, duplicate at 298.) Although Dr. Maddox diagnosed Plaintiff with major depression, he described Plaintiff's mood on the date of his visit as only "somewhat depressed" and "anxious". (R. at 256, duplicate at 298.) Dr. Maddox noted that Plaintiff had no suicidal or homicidal ideation, and he described Plaintiff as having intact intellectual functioning with no hallucinations or belief that he was being watched. (R. at 256, duplicate at 298). While Dr. Maddox's GAF score of 35 - 45 is, on its face, inconsistent with the GAF scores assigned to Plaintiff by Drs. Kampa and Karp, this one-time score does not, given the other findings in Dr. Maddox's evaluation report and the other evidence in the record, present substantial evidence to contradict the ALJ's determination regarding Plaintiff's mental impairment. Nor does this inconsistency indicate the ALJ gave undue deference to the GAF score assessment or opinion of Dr. Karp.[8]

---

[8]The fact that the ALJ disagreed with some of Dr. Karp's findings and rejected them is further evidence that the ALJ did not give undue deference to Dr. Karp's opinion. The ALJ rejected Dr. Karp's opinion that Plaintiff had only minimal impairment in his ability to interact with the general public or co-workers. (R. at 213.) Instead, the ALJ concluded that Plaintiff's mental impairment imposed "marked limitations on his ability to maintain social functioning" and limited him

As additional support for his argument that the ALJ failed to give proper deference to the GAF scores assigned to Plaintiff by Drs. Kampa and Maddox, Plaintiff contends that Robert Gervais, M.D., diagnosed Plaintiff as having bipolar disorder on April 10 and May 31, 2000.[9] There are several problems with this argument. First, it is not clear from the record that Dr. Gervais diagnosed Plaintiff as bipolar. The April, 2000, medical report cited by Plaintiff does not mention bipolar disorder. (R. at 317 - 318.) Additionally, this report is not from Dr. Gervais but from social worker Pé Gerard Weideman (R. at 318), who is not an acceptable medical source for establishing the mental impairment alleged by Plaintiff. *See* 20 C.F.R.§§ 404.1513(a) and 416.913(a) (2003). The May, 2000, medical report cited by Plaintiff, which does appear to have been prepared and signed by Dr. Gervais (R. at 320), mentions bipolar disorder but only once in the notation "cc bipolar disorder + ADHD?". This notation, with a question mark, does not clearly indicate a diagnosis of bipolar disorder and the "cc"[10] in the notation may indicate that Dr. Gervais was merely recording bipolar disorder as Plaintiff's chief complaint. Second, neither medical report cited by Plaintiff relates to the period under review since both are dated and relate to the period after the ALJ's decision. (R. at 318, 320.) Neither report expresses an opinion regarding Plaintiff's medical condition prior to the date of the ALJ's decision. Because these reports do not relate to the period on or before the date of the ALJ's decision, they cannot be considered as evidence of Plaintiff's mental impairment. *See* 20 C.F.R.

---

to simple, routine and non-public work. (R. at 20 - 22.)

[9] There is no evidence in the record that Dr. Gervais assigned a GAF score to Plaintiff.

[10] "CC" is a common medical abbreviation for "chief complaint". Thomas Lathrop Stedman, *Stedman's Medical Dictionary* 2001 (27th ed., Lippincott Williams & Wilkins 1999).

§§ 404.970(b) and 416.1470(b) (2003). *See also, O'Dell v. Shalala*, 44 F.3d 855, 858 - 859 (10th Cir. 1994).

Finally, the record clearly shows that the ALJ did not base his evaluation of Plaintiff's mental impairment solely on Dr. Karp's GAF score assessment or the other GAF scores for Plaintiff in the record. This was appropriate since GAF scores, while relevant evidence of mental impairment, are not absolute determiners of the ability to work. *Stalvey v. Apfel*, 242 F.3d 390 (Table), 2001 WL 50747, at *2 (10th Cir. 1999) (unpublished). As the Tenth Circuit held in affirming a prior decision of this district:

> [A] GAF score of 40 may indicate problems that do not necessarily relate to the ability to hold a job. . . . Thus, standing alone, the GAF score does not evidence an impairment seriously interfering with claimant's ability to work. "While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." *Howard v. Comm'r of Soc. Sec.* 276 F.3d 235, 241 (6th Cir. 2002) (holding that ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate"). [The examining physician who determined the GAF score] did not indicate that claimant could not work. His assessment of claimant's GAF score, standing alone, does not undermine, nor is it 'significantly probative' evidence in opposition to, the ALJ's ultimate conclusions concerning the seriousness of claimant's mental status or ability to work. . . .

*Lopez v. Barnhart,* 78 Fed. Appx. 675, 678, 2003 WL 22351956, at *2 (10th Cir. 2003) (unpublished). The ALJ's decision includes a thorough analysis of the evidence of Plaintiff's mental impairment including Plaintiff's medical records, the testimony of Plaintiff and his wife at the administrative hearing, the reports of the state agency reviewing psychiatrists and the report of Dr. Karp. (R. at 318 - 324.) While the ALJ noted and considered the evidence of Plaintiff's GAF scores

in the record, he did not base his determination regarding Plaintiff's mental impairment on that evidence alone and the ALJ's consideration of Plaintiff's GAF scores was not in error.

### *2. "Double-Talk" Issue*

Plaintiff contends that the ALJ engaged in "double-talk" by finding that Plaintiff's mental impairment was severe but not finding that Plaintiff was disabled by his mental impairment. The Court does not find this to be "double-talk". Instead, the record shows that the ALJ followed the correct procedure for evaluating Plaintiff's mental impairment required under the Social Security regulations. Following this procedure, the ALJ found that Plaintiff's mental impairment was severe but that it failed to meet the requirements of, or equal in severity, an impairment contained in the Listing of Impairments. (R. at 24.) A finding of severe impairment does not automatically lead to a determination of disability. A social security claimant's severe mental impairment must meet the requirements of, or be equal in severity to, a listed impairment in order for the claimant to be found disabled at step three of the evaluation sequence. 20 C.F.R. §§ 404.1520(d), 404.1520a(d)(2), 416.920(d) and 416.920a(d)(2) (2003).

In his applications for benefits, Plaintiff claimed disability due, in part, to bipolar affective disorder, obsessive/compulsive disorder and ADHD. (R. at 107.) When there is evidence of a mental impairment that allegedly prevents a claimant from working, the Commissioner must follow the procedure for evaluating mental impairments set forth in 20 C.F.R. §§ 404.1520a and 416.920a (2003). The procedure followed must be appropriately documented. 20 C.F.R. §§ 404.1520a(e) and 416.920a(e) (2003). The Commissioner must first evaluate pertinent symptoms, signs and laboratory findings to determine if the claimant has a medically determinable mental impairment. These are sometimes referred to as the "Part A" criteria. 20 C.F.R. §§ 404.1520a(b)(1) and 416.920a(b)(1) (2003). Then the Commissioner must evaluate the degree of functional limitation resulting from the

11

impairment, using what are called the "Part B" criteria. 20 C.F.R. §§ 404.1520a(b)(2) and 416.920a(b)(2) (2003). To record his or her conclusions, the Commissioner must prepare a standardized document called a Psychiatric Review Technique Form ("PRTF") which evaluates the claimant under the Part A and Part B criteria. 20 C.F.R. §§ 404.1520a(e) and 416.920a(e) (2003). In this case, the ALJ properly completed a PRTF for Plaintiff and attached the completed PRTF to his decision.

The ALJ's decision and PRTF indicate that the ALJ found Plaintiff had a severe mental impairment (R. at 20, 24, 26). In the PRTF, the ALJ noted that Plaintiff had dysthymia[11], personality disorder with antisocial traits and substance addiction disorders (R. at 28). The ALJ reached this conclusion based on the report of Dr. Karp and the other evidence in the record. In rating the degree of limitation in the four Part B criteria, the ALJ found that Plaintiff had slight restrictions in activities of daily living, marked difficulties in maintaining social functioning, seldom deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and one or two episodes of deterioration or decompensation in work or work-like settings . (R. at 29.) Because these degrees of functional limitation indicated a "severe" impairment, it was necessary for the ALJ to decide whether Plaintiff's mental impairment met the requirements of, or was equivalent in severity to, a listed impairment. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2) (2003). Because only one of Plaintiff's functional limitations, difficulties in maintaining social functioning, had a degree of limitation that satisfied the listing requirements (R. at 29), the ALJ properly concluded

---

[11] "Dysthymia" is a "chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feeling of hopelessness". Thomas Lathrop Stedman, *Stedman's Medical Dictionary* 556 (27th ed., Lippincott Williams & Wilkins 1999).

that Plaintiff's mental impairment failed to satisfy the requirements of a listed impairment. (R. at 24.) However, because Plaintiff had a severe mental impairment that did not meet the requirements of, or equal in severity, a listed impairment, the ALJ had to determine Plaintiff's RFC. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3) (2003). In determining Plaintiff's RFC, the ALJ found that Plaintiff was limited by his mental impairment to simple, routine, non-public work. (R. at 22.) The evidence in the record supports this finding.

In support of his argument that he is disabled by his mental impairment, Plaintiff relies on the GAF score of 35 - 45 assigned to him by Dr. Maddox in December of 1998 (R. at 256, duplicate at 298) and Dr. Maddox' diagnosis of major depression in December of 1998 (R. at 256, duplicate at 298) and February of 1999 (R. at 294). Plaintiff also relies on the testimony of his wife at the administrative hearing who stated that Plaintiff does not really have friends, has poor sleeping habits, sometimes has a poor appetite, is depressed, has memory problems, is unable to do things around the house that he used to do and has feelings of worthlessness. (R. at 64 - 69). The record indicates that the ALJ considered this evidence in making his determination (R. at 19 - 21), and this evidence is consistent with the ALJ's conclusion that Plaintiff suffered from dysthymia. Additionally, as discussed above, there are seven other GAF scores for Plaintiff in the record that are higher than the GAF score assigned by Dr. Maddox and GAF scores are not absolute determiners of the ability to work. *Stalvey v. Apfel*, 242 F.3d 390 (Table), 2001 WL 50747, at *2 (10th Cir. 1999) (unpublished). Dr. Maddox did not indicate that Plaintiff could not work and the report of Dr. Maddox and the testimony of Mrs. Singleton are not substantial evidence that Plaintiff suffered from a listed mental impairment. The record shows that the ALJ properly considered this evidence in his evaluation of Plaintiff's mental impairment.

Plaintiff's medical record is complex and, as noted by the ALJ, it is difficult to determine the appropriate diagnostic criteria to apply. However, the evidence in the record supports the ALJ's conclusion that Plaintiff suffered from dysthymia, personality disorder with antisocial traits and substance addiction disorders (R. at 28). The Court finds that the ALJ properly applied the mental impairment analysis required by the Social Security regulations and properly recorded his findings on a PRTF. Substantial evidence supports the ALJ's findings regarding Plaintiff's mental impairment and the ALJ's decision regarding Plaintiff's mental impairment will be upheld.

### B.  Evaluation of Plaintiff's Physical Impairment

Plaintiff contends that the ALJ made the following errors in evaluating Plaintiff's physical impairment: (1) finding that Plaintiff retained the RFC to engage in any work activity given his diagnosis of carpal tunnel syndrome and related physical symptoms and limitations; (2) propounding hypothetical questions to the vocational expert ("VE") that were incomplete and lacking in Plaintiff's manipulative limitations; and (3) disregarding the VE's opinion that Plaintiff would be unemployable in response to a hypothetical question by Plaintiff's counsel.

#### *1.  Carpal Tunnel Syndrome*

In support of his argument that Plaintiff is disabled by carpal tunnel syndrome, Plaintiff relies on his testimony at the hearing that he suffered from numbness and swelling in both hands, crooked fingers and a propensity to drop things. (R. at 61 - 62.) The record shows that the ALJ considered this testimony but properly found there was no medical evidence to support these claims. (R. at 17.) In fact, as noted by the ALJ, the record contained medical evidence to the contrary. (R. at 17.) The evaluation of Plaintiff in the record by consultative physician Alan Jakins, M.D., who examined Plaintiff in October of 1998, concluded that Plaintiff had a full and painless range of motion in his shoulders, elbows and both wrists, could extend his hands and oppose his fingers, and had good grip

14

strength bilaterally (R. 237 - 238, 240.)  Additionally, at the administrative hearing on November 16, 1999, Plaintiff testified that he could open and close his hands and make a fist (R. at 57), and could pick up a coin off a table top if he was looking at it (R. at 62).  Nevertheless, in determining Plaintiff's RFC, the ALJ took Plaintiff's testimony into account and concluded that Plaintiff was limited to jobs that did not require digital dexterity. (R. at 22.)

Plaintiff also relies on the report of Meenakshi Nayak, M.D., in support of his argument that he is disabled by carpal tunnel syndrome.  (R. at 316.)  This report is dated April 25, 2000, two months after the date of the ALJ's decision.  Dr. Nayak's report states that Plaintiff has "numbness in both hands and paresthesias [sic]"[12] and diagnoses Plaintiff with "carpel tunnel syndrome, bilateral". (R. at 316).  However, Dr. Nayak's report does not include any opinion regarding the severity of Plaintiff's carpal tunnel syndrome or describe any functional limitations associated with Plaintiff's carpal tunnel syndrome.  Nor does Dr. Nayak's report indicate that his report and diagnosis of carpal tunnel syndrome relate to the period prior to the date of the ALJ's decision.

Dr. Nyak's report cannot be considered as evidence that Plaintiff was disabled by carpal tunnel syndrome during the relevant review period because the report does not relate to the period on or before the date of the ALJ's decision.  *See,* 20 C.F.R. §§ 404.970(b) and 416.1470(b) (2003).  *See also, O'Dell v. Shalala*, 44 F.3d 855, 858 - 859 (10th Cir. 1994).  Moreover, even if Dr. Nayak's report was considered as evidence of Plaintiff's physical impairment, the report does not establish how, if at all, Plaintiff's physical abilities were affected by carpal tunnel syndrome.

---

[12]Paresthesia is "an abnormal sensation, such as of burning, pricking, tickling or tingling." Thomas Lathrop Stedman, *Stedman's Medical Dictionary* 1316 (27th ed., Lippincott Williams & Wilkins 1999).

The Court finds that the ALJ properly concluded, based on evidence in the record for the relevant review period, that Plaintiff was not physically disabled by carpal tunnel syndrome. Additionally, the Court finds that the ALJ gave proper consideration to Plaintiff's manipulative limitation by finding that Plaintiff was limited by his physical condition to jobs that did not require digital dexterity to perform basic requirements of the job. (R. at 24.)

### 2. *Hypothetical Questions to VE*

Plaintiff argues that the ALJ's hypothetical questions to the VE were in error because they were incomplete and lacking in the manipulative limitations of Plaintiff's carpal tunnel syndrome. In propounding hypothetical questions to a VE, the ALJ must include all of a claimant's limitations that are supported by the record. *See Shepherd v. Apfel*, 184 F.3d 1196, 1203 (10th Cir. 1999); *Gay v. Sullivan*, 986 F.2d 1336, 1340 - 1341 (10th Cir. 1993).

In his hypothetical questions to the VE, the ALJ included the manipulative limitation he found to exist related to Plaintiff's digital dexterity. The ALJ's hypothetical questions to the VE asked the VE to assume that Plaintiff's limitations included that he "should not work in a position that requires digital dexterity, but gripping and handling are satisfactory." (R. at 71.) Thus, the ALJ's hypothetical questions included Plaintiff's manipulative limitation that was supported by the record and his questions to the VE were not in error. In response, the VE testified that the hypothetical person described by the ALJ could not perform his past relevant work but could perform production line assembly work and machine setter or machine operator work. (R. at 71 - 72.)

Plaintiff also argues that the ALJ disregarded a hypothetical question to the VE by Plaintiff's attorney to which the VE responded that Plaintiff would be unemployable. (R. at 73.) Plaintiff's attorney did propound a hypothetical question to the VE, but there was no mention of manipulative

16

limitations in the question. (R. at 73.) Instead, the attorney's hypothetical question asked the VE to make the additional assumption that Plaintiff had side effects from medication three out of five days that made him feel hung-over in the morning and kept him from functioning until ten or eleven o'clock in the morning. (R. at 73.) The VE responded to this question that she thought this would make Plaintiff unable to work. (R. at 73.) Although there were statements in the record by Plaintiff that he wakes up in the morning feeling hungover for two to four hours, there was not substantial evidence of this condition in the record. Nor was there substantial evidence that this condition made him unable to work. Plaintiff's testimony alone is insufficient evidence to establish the existence of an impairment. *See Shephard v. Apfel*, 184 F.3d at 1203.

In light of the foregoing, the Court finds that the ALJ's hypothetical questions to the VE were not in error.

### C.  Evaluation of Plaintiff's Credibility

Plaintiff contends that the ALJ erred in assessing Plaintiff's credibility. Specifically, Plaintiff argues that the ALJ's finding that Plaintiff is "not credible" is a mere conclusion disguised as a finding and is not linked to substantial evidence in the record.

In determining Plaintiff's RFC, the ALJ considered all of Plaintiff's symptoms, including pain, and the extent to which Plaintiff's symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence in the record based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929 (2003), and Social Security Ruling 96 - 7p (1996). (R. at 21.) In making his assessment of Plaintiff's credibility, the ALJ found that Plaintiff's "allegations regarding his subjective symptoms and limitations are not totally credible and cannot be relied upon to determine the extent of his functional limitations." (R. at 24.)

17

In evaluating a claimant's subjective symptoms, an ALJ's findings on credibility "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F. 3d 387, 391 (10th Cir. 1995) (quotation omitted). In this case, the ALJ's decision set forth specific reasons for his credibility determination which are supported by substantial evidence in the record.

The ALJ found that Plaintiff's allegations regarding his subjective symptoms and limitations were not totally credible based on the following: (1) inconsistencies in Plaintiff's statements of record concerning his subjective symptoms and limitations; (2) lack of medical evidence to support Plaintiff's statements; and (3) inconsistencies in Plaintiff's statements about the daily activities he performed. (R. at 21 - 22.) These inconsistencies are confirmed by the record.

The record indicates that Plaintiff made inconsistent statements about his subjective symptoms and limitations. For example, Plaintiff gave inconsistent reasons as to why he stopped working in 1991. At various places in the record, Plaintiff said that he stopped working in 1991 because he was laid off, that he left his job because the work was part-time and that he left his job because of knee pain. (R. at 42, 115, 210. ) Plaintiff also made inconsistent statements about receiving mental health care treatment (R. at 212, 237) and suffering seizures (R. at 47 - 48, 104).

The record further indicates that a number of Plaintiff's statements are not supported by, or are contrary to, medical evidence in the record and Plaintiff's testimony. For example, Plaintiff testified at the administrative hearing that he could not bend his fingers and dropped cigarettes. (R. at 62.) Yet the medical evidence showed that in October of 1998, Plaintiff had the ability to make a fist and pinch bilaterally (R. at 237) and had good grip strength bilaterally (R. at 238). Plaintiff also testified at the administrative hearing that he could open and close his hands and make a fist (R. at

18

57), and could pick up a coin off a table top if he was looking at it (R. at 62).  With respect to his knees, Plaintiff reported that his physician, James Boss, M.D., limited his walking, standing, lifting and any other activity that would put stress on his knees (R. at 109).  However, Dr. Boss's medical notes only show that he advised Plaintiff to avoid high impact activities and to continue a home exercise program. (R. at 205.)  With respect to employment after his release from prison, Plaintiff testified at the administrative hearing that he did not look for a job after he was released from prison in March of 1998 because his doctor gave him a release saying he was not able to work.  (R. at 43.)  Yet the medical records indicate that his physician, Dr. Boss, in June of 1998 after Plaintiff's knee surgery, only advised Plaintiff to avoid high impact activities and  continue with his home exercise program.  (R. at 205.)

    The record also indicates that Plaintiff made inconsistent statements about the daily activities he performed.  At the administrative hearing Plaintiff testified that he only occasionally helped his wife with the housework and did not work outside in the garden or yard. (R. at 51.)  However, elsewhere in the record Plaintiff stated that on a typical day he washed dishes or vacuumed the house, and that he sometimes raked leaves and sat on a milk crate and watered grass or pulled weeds in the summer. (R. at 133.)  Plaintiff also stated that he prepared meals such as hamburgers, canned goods or grilled meats. (R. at 134.)  Plaintiff told consultative psychiatrist, Robert Karp, that he constantly cleaned, that he vacuumed the house once a week and that he picked up everything that dropped on the floor. (R. at 210).

    The ALJ relied upon appropriate factors to support his assessment of Plaintiff's credibility and he did not misrepresent Plaintiff's testimony or other evidence regarding Plaintiff's subjective symptoms or limitations.  The ALJ's finding that Plaintiff was not totally credible is supported by

substantial evidence in the record. Credibility determinations are peculiarly the province of the fact finder and should not be upset when supported by substantial evidence. *See Kepler v. Chater*, 68 F. 3d 387, 391 (10th Cir. 1995). The Court will not substitute its judgment for that of the Commissioner. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). The ALJ set forth the specific evidence that he relied on in evaluating Plaintiff's credibility and the Court finds that the ALJ's assessment of Plaintiff's credibility in connection with his evaluation of Plaintiff's subjective symptoms and limitations was properly made based on substantial evidence in the record.

### IV. Conclusion

In conclusion, the Court **FINDS** that the Commissioner's decision is supported by substantial evidence in the record as a whole and comports with relevant legal standards. Accordingly, the Court will **AFFIRM** the decision of the Commissioner.

**WHEREFORE, IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and Plaintiff's Motion to Reverse or Remand Administrative Agency Decision *(Doc. 9)* is **DENIED**. A final order will be entered concurrently with this Memorandum Opinion and Order.

*Lourdes A. Martinez*
_____
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent